The ten minutes aside would be enough on this case. I would think so, Your Honor. Yeah. If I may, Leonard Steiner for Dr. Brooks. William Foster is a bad man, there's no other way to say it. He defrauded Dr. Brooks out of millions of dollars when he was handling his stock brokerage accounts. That fraud included sending Dr. Brooks false statements of accounts where, so while Dr. Brooks was actually losing money, Foster was sending Dr. Brooks statements showing you were making $3 million. But the case, as it comes to us, really presents a single issue relating to fraudulent transfer. Assuming that the transferor engaged in a fraudulent transfer, the question, as I see it at least, is whether the purchaser established the exception for good faith so that it no longer has to disgorge the property. I think that is the crux of the issue. And where is the genuine issue of fact that there was, as opposed to speculation, what's in the record to demonstrate that the purchaser of the property did not act in good faith? Okay. And I think it's simply where you have Foster, who is a co-trustee of the trust. A trust can only act through its trustees, just like a corporation can only act through its officers, directors, and employees. A trust can't act on its own. So you have one trustee who has spent his life trying to arrange his life to be judgment proof while he goes around defrauding his clients, selling his property to the other trustee. I think it's a ---- And he was no longer a trustee at the time of the sale. At the time the sale was consummated, he had resigned. In fact, he resigned at the request of the other trustee because the other trustee They said he wanted to be arm's length, which sounds a lot like good faith. Well, I don't think it sounds like good faith. Because I have a question about that, and that's if he's a co-trustee during the course of negotiations or structuring of this, and then the other trustee says, why don't you resign so we can do this? Wouldn't his knowledge still be imputed to the other trustee for the period when they were setting this up? Absolutely. So at the time they closed the deal, maybe he's no longer a trustee, but that doesn't negate if his prior knowledge was imputed to them. I couldn't agree more, and that's the thrust of my brief, that as a trustee, as a co-trustee, whatever knowledge he had was imputed to the other co-trustee. Well, but the trustee that ended up a non-Foster trustee, he knew that the trust was for the benefit of Foster. Of course. This is no mystery. I mean, it just was set up by them. And Foster lives very high off the Hark. He lives in a sort of picture, so I could show you this. It's relatively irrelevant, but if Foster's knowledge is imputed to the other trustee, the other trustee, which I guess is a key legal issue as I see it, the other trustee knows not only that the trust is for Foster's benefit, he knows that Foster's trying to defraud creditors. Absolutely. Right? He knows that's the whole scheme. Absolutely. Well, I have a question here whether this whole good faith purchaser provision, the statutory provision that we're dealing with here, even applies when, applies at all, when the purchaser is a trust of which the seller is a beneficiary. I don't know the answer to that. I did a little reading. There's no state law on that precise issue. I didn't find any state law on that precise issue. I didn't find any on that or anywhere exactly, but to me it doesn't make, I guess I'll direct this question to the appellee, the appellee's argument, it doesn't make a lot of sense for that provision to apply in this context to me. I'll need to hear an argument on that. I think you have the gist of the argument that I have and the, I would say that not only should the district court's order granting summary judgment in favor of Bessemer be reversed, but it should have been granted in favor, Brooks's motion for summary judgment should have been granted because it was based on the same set of facts that whatever knowledge Foster had was imputed to the trust. And remember Foster here didn't even defend this lawsuit. So he's admitted by his lack of defense that he, that this whole thing was set up as a fraud against creditors. The only issue now remains Bessemer's good faith. And if we impute the knowledge from Foster to Bessemer, then summary judgment should be granted in favor of Dr. Brooks. I thank you. I have nothing further, and I'll just reserve whatever. I don't know where the panel is. Can't the creditors, can't your client go after Foster as a beneficiary of this trust? Foster has no money that isn't tied up in trust. He has his home in Florida tied up in trust. He has his $350,000 Bentley tied up in trust. We have a judgment against him, right? A $3 million judgment. You've collected as much as we have on that judgment. It's a judgment-proof situation. It's a situation where he's judgment-proof. Of course, because he's wealthy, but everything's in his trust set up by Bessemer. But you can't foreclose on his interest in the trust. Well, we're trying to do that in Florida. One of the parts of the record is a Florida complaint. We've been proceeding against Foster in Florida for almost two years to try to collect money from him. God made Florida. It's a place where people can go. I remember, I think it was Commissioner Bowie-Hugh, we got in trouble, who picked up and moved to Florida in four minutes because he could homestead your entire net worth and be judgment-proof, and that's where Mr. Foster is. That's where the pirates used to hang out. I guess you can go to Florida and buy the most expensive home you want. No one can ever get it. The current law is exactly that. Put all your money into your home in Florida and be safe. I think they just passed some of the recent amendments to the Bankruptcy Act, I think dealt with a part of those issues, but they don't even go into effect until this October. Maybe you want to reserve some time. Yes. Because maybe your opponent will have some good answers to the arguments. Thank you. Thank you, Your Honors. Sheila Schwager, may it please the Court. Sheila Schwager representing Vestmer Trust Company, which is a professional management trust company that's been in business since 1907. Your Honors, I will directly address the issue regarding the argument regarding whether you can impute knowledge to Vestmer Trust, but first I would like to point out this is a new argument being raised on appeal that was not raised below before the district court and for which we did not have an opportunity to address on summary judgment. I think that was addressed in your briefing. Yes, Your Honor. I think in the reply brief they said that they did address that and quoted some briefs that they wrote where they said something like it. So, I mean, we'll take another close look at that. And I would appreciate that, Your Honor, because on page the one portion of the brief that they cite was a brief dealing with Foster's fraudulent intent. It had nothing to do with Vestmer and it had nothing to do with imputing knowledge. What it was talking about is whether under the insider badges of fraud you could say that Vestmer Trust Company was an insider because they purportedly shared some undefined information, not that you could ever impute knowledge from one trustee to another trustee. And none of the legal authorities that they've cited before this court were ever cited to the district court below. Let's assume for a moment, though, that we have to reach that. Thank you, Your Honor. Yes, absolutely. We have to decide in the interest of justice to reach it even if it wasn't raised. What's the answer? Why wouldn't – if Foster is a co-trustee – I mean, one thing if Vestmer buys this for a different trust, but if Foster is a co-trustee and at the time he's serving as a co-trustee, he has fraudulent intent, even though Vestmer might be wonderful people, why wouldn't that be imputed to them constructively, at least for purposes of the issue here? Well, Your Honor, and the first issue that – or the first thing that you need to look at is what fraudulent knowledge you would even be imputing because in this case they have never set forth any specific allegations of fraud, even in the complaint. I thought that they were saying that he's trying to get the property out of his name so that he can be judgment-proof and defraud his creditors. But in return, Your Honor, for that purchase of the property, he received $580,000 to his personal account. He can burn the money up. It's not saying Vestmer is defrauding him, but if he's trying to defraud his creditors by saying, I'll get a bunch of cash, I'll get rid of this ski chalet or condo in Idaho, and I'll take all that cash and I'll buy wine and stuff I can have fun with, or I'll go buy a house in Florida and no one will ever be able to touch it. You know, if that is his intent, why – under normal principles, I guess the common law principles, why wouldn't the co-trustee be – why wouldn't the trust be tagged with that while he's a co-trustee? Well, Your Honor, under the Restatement Second of Agency, it states that a principal can be a bona fide purchaser even if its agent has some purported fraud. And specifically, Comment J to the Restatement of Agency of Section 282, which is the set forth in our brief, states that if the principal obtains title to property because of the independent fraud of his agent, he may still be a bona fide purchaser if, without knowledge of the fraud, he pays value to the agent. And that – in this case, he received $580,000. Bessemer Trust did not deplete his personal estate by taking the property. He received $580,000 that was sent to his personal account. And the case authority – Foster's estate wasn't – Foster's estate wasn't depleted, but his creditors were disadvantaged if they could no longer get the Idaho property. But, Your Honor, the case law is clear, such as in Interstate Acceptance Corp., which is cited in our brief, that a buyer is not to be a guardian of a seller's creditors and cannot be held to have participated actively in the fraud just because seller's creditors may lose some ability to go after an asset, such as real property. And, I mean, in this case, Brooks didn't even exist. A claim against Foster didn't even exist when the real property was sold. I thought that when it was sold, there had been a claim asserted, but there hadn't been an arbitral award yet. That's correct, Your Honor. It was – a judgment wasn't rendered until a year and a half after the property was purchased. Brooks wasn't yet a creditor, but he was a claimant. Correct, Your Honor. Okay. I have a whole different question, if you don't mind me – No problem, Your Honor. You handled that one so well that I'm going to ask you another one. Let's assume for a minute, let's forget about the fact that he's a co-trustee. Just should the bona fide purchaser statutory provision in Idaho, should it apply in a case where the purchaser is a trust that holds things for the benefit of the seller? I didn't find anything in Idaho law about that, but it seems unusual. You know, it's not the normal bona fide purchaser type case. Well, Your Honor, actually, there is lots of trust law that's clearly established out there that it is absolutely lawful and permissible for parties to put assets into trust and to sell assets in trust, provided that they are doing it in accordance with state law. And Brooks is attempting in Florida to attach beneficial interest or to attack different trusts that Foster has. But that is the avenue to go. You don't go after Bessemer Trust Company, which does a six-month due diligence and determines whether it's an appropriate asset of the trust and actually pays out $580,000 for that property, to say that that's fraudulent and that they can't do that. But what it paid out was it paid out trust funds that were for the benefit of Foster. Well, actually, Your Honor. Foster. Wasn't he the beneficiary of the trust, him and his kids? Absolutely, Your Honor. Actually, it's set forth in David Derry's affidavit. He is one of the beneficiaries. The principal beneficiaries were the children. And the trust was that the property came from the late Deborah Foster. It actually came from her grandmother. And so it was property that her grandmother owned that then went to Deborah Foster, and then she, through her will, appointed it to the Joint Revocable Trust, which was then put in the Credit Shelter Trust, which is a – it's set up for the benefit of her children. And so to now say, well, because Foster sold it to the trust and got $580,000 from it, now you have to give it back to Foster and no longer would the children benefit from it in accordance with the trust terms, that are all lawful. I mean, Bessemer Trust Company has been in business since 1907 and handles its trust pursuant to the state laws. And what they're doing was lawful. And they – if you go through David Derry's affidavit, they go through a six-month due diligence period of which Foster never had any control over the State Committee. They concede below that Bessemer and Foster never colluded. They concede below that they had no evidence that he could use his influence as a co-trustee to determine whether they would ultimately purchase the property. And they concede below that it was reasonably equivalent value. So if Brooks really felt that Bessemer did not have good faith and couldn't fall within that standard, then why didn't they conduct depositions of Bessemer's personnel? Why didn't they conduct depositions of Foster? And if you look at the discovery that's attached to my affidavit, they have no facts to support their contention that Bessemer didn't act in good faith when it purchased the property. And in raising the issue of whether a co-trustee or a trust could ever even purchase property from a co-trustee or a beneficiary and whether that would be, it would always be a fraudulent transfer. Not whether it could ever do it or it would always be a fraudulent transfer, but whether in the case of a fraud a trust can claim it's a good faith purchaser when the trust is buying from a seller who's a beneficiary of the trust. Well, Your Honor, as set forth in David Derry's affidavits and not refuted by Brooks, it is within the ordinary course of business and standards of trace within trusts to purchase from beneficiaries. And even as for them being a co-trustee, Bessemer took the high road and said we're not going to even let it be a perception that he was involved and that he could be involved in this decision. And so they said if you really want us to consider this, you need to resign, which he did. What's the timeline in terms of how long this was being considered? While he was a trustee versus when he resigned and when the deal closed. He requested, he informally requested it in July. They went through some procedures of due diligence. Then in December he resigned. Then they went through further due diligence. In January 11th it was approved, and then ultimately the sale took place in March of 2000. What was the due diligence? That was conducted by Bessemer. They obtained information and documentation regarding the contract and some information regarding the real property from Foster. And then Campanelli of Bessemer said that, stated that he was familiar with the area. And he conducted. Who of Bessemer? Campanelli, Angelo Campanelli. I thought you were talking about the Campanelli. Go ahead. It probably is, Your Honor. But in the record attached to Derry David's affidavit, there's a memo from him where he lays out the specifics of why he thought this would be a good investment. He looked at the area, how many units were going to be built in the area, what the transportation was like, what the actual ambience was like, and the values of the property. But part of that being to run a credit check on Foster? Oh, Your Honor, I'm sorry. I'm out of time. Your Honor, the case authority that's set forth in the brief, there is no obligation to actually run a credit check on a seller of property. And even if they would have run a credit check, there's certainly nothing in the record to indicate that they would find anything bad. I mean, when he requested that they purchase this property, there had never even been a claim filed. And I would note that no list pendants was ever filed prior to the purchase of the property, even though the arbitration claim had been filed. No what was filed? List pendants. List pendants. There was just nothing out there that would have alerted Bessemer to an issue as to Foster. And there's nothing in the record actually to show that Foster is a bad man. I mean, all of these allegations that are being made, there is no record. We're not casting any aspersions on your client. Oh, Your Honor, he's not my client. I'm Bessemer. No, I mean Bessemer. Yeah, right. Bessemer. Bessemer. Right. Bessemer, like a Bessemer converter. Right. I have another question that I just wanted to ask her this. You know, it just seems to me like this is just a dodge, isn't it? You know, the guy's been, let's say, taking other people's money and horsing around and all that, and then he sees he's got this and he wants to protect that asset, so he takes it and he gives it to a reputable entity that's a trustee for his benefit. And receives $580,000, and it's principally for the benefit of his children. And, Your Honor, when he first purchased this property, there had been no claim made against him. And, in fact, when he – what you have to do is look at the record, not what's being argued in the briefs, because the record doesn't support what's being argued in the briefs. There's no indication that even Foster was committing fraud. The complaint was not specific. There's no affidavit saying how he committed the fraud. It's just speculation. Well, if I understand your argument correctly, it is at least in part that even if you had known that he owed a lot of money to someone else, that wouldn't have changed things, because presumably you would have been able to rely on the presumption that he would have used the cash to pay his creditors. And it's only if you knew something more than that he owed money, that is, that he owed it and he was looking for a way not to pay it, that you should be tagged. That's absolutely what is set forth in the case authorities, Your Honor. That's absolutely true. Let me just ask if the record answers this question. Does the record tell us in what proportion he, as opposed to the children, were beneficiaries of the trust? Like children get 90 percent and he gets 10, or he gets 90 percent and they get 10? It does lay it out, Your Honor, I believe, in Excerpt of Record 17 in David Derry's affidavit, that the children were the principal beneficiaries of the trust and that no money could be used from the trust to go to the trust store, which would be foster, until after other trusts, A and B, had been utilized or used up, and there's just nothing in the record to indicate that ever happened. And it is laid out in Derry's affidavit that this is actually how the assets got into the trust, that they were the late Deborah Foster's and actually her grandmother, and that this trust was set up for the benefit of his children, of her children. Thank you, Your Honor. Was your grandmother part of the family that developed the Bessemer converter? I don't know, Your Honor. I'm sorry. Thank you for your time. That was a different converter, you know. If I may, just a couple of seconds. I believe that under the trust, and I don't think the trust document is part of the record, I believe under the trust that William Foster is the life estate beneficiary of the trust and that the children are. . . The children take after he dies? Yes, the children get the money after he dies, and he's the one who's living off the property and doing it. You're saying that's not in the record, or it is in the record? The trust itself isn't in the record. I believe I would have to check. I don't think it's in the record, but it's my understanding. It might be in the record as part of the Florida complaint. I don't think it . . . I would have to check. I don't want to speak out of turn. What happened to the money? The $580,000? Oh, I'm sure it's homesteaded in Florida where he has a house. I mean, this man has made himself completely judgment-proof, and he's using Bessemer Trust to legitimize it. Is there anything other than the imputed nature that sort of the law that Judge Gould was asking you about that suggests that Bessemer actually knew that not only that Foster owed a lot of money to others, but that he was affirmatively not going to use any of this money to pay them? I don't think the record goes that far, but I think the record does show that Bessemer . . . that there were problems with this deal that Bessemer was aware of. For instance, one of the SID committee members on Bessemer raises, why are we buying this property for this trust? It's wholly inappropriate. The next . . . and I could cite to the record on that. But what inference does that show inappropriate for any number of reasons? That doesn't seem to necessarily suggest that there was knowledge of fraud on the part of Bessemer. The next thing that happens does. The next thing is a letter from Terry Bruner, who was one of the Bessemer people, saying Mr. Foster really would like to get this done. So Foster is the one who's pushing to get this done. So you have . . . If I wanted to pay my bills rather than defraud my creditors, I might really push to sell an asset and get $600,000 worth of cash. So again, why is that . . . But he didn't. I know he didn't, but how do we know from the record, as distinct from your arguments, that Bessemer actually knew that? There is nothing in the record that would show what Bessemer knew on that regard. First of all, they could have pulled his CRD and seen the claim. So there is a public record that exists. He is a stockbroker. I don't know if the Court is familiar with this, but you can go on the NASD website, pull a document called a CRD on any stockbroker, and it will tell you all claims that are filed against the stockbroker. So certainly, as of December 10, 1999, Bessemer could have gone online to the NASD and pulled the information that he was being sued for $10 million by Dr. Brooks. So there was a public record available. This is available to anyone in the world. Just go on the NASD website and you can follow a few directions and you get it. So that was available to anyone in the world. What's the doctor's specialty? He was an eye surgeon. He was actually one of the developers of the cataract surgery that they've been doing for the last 15 years. The old ones used to hack you up for an hour and a half, and now they do it in 15 minutes. He was one of the developers of that surgery. Well, my eye doctor told me he was the developer. And maybe it has to do something with who discovered the Internet or whatever. I guess there are a lot of people who have it. But Dr. Brooks worked directly under the surgeon who's credited for it. He was a student of that surgeon and worked under him for many years developing this surgery. So he was one of the developers. Where did he go to medical school? I'm not sure where he went to medical school, Your Honor. I know he practiced for a very long period of time in San Diego where he met Bill Foster at the country club and played golf together. And that's how he met Bill Foster. And in 1994, he handed over all his money to Mr. Foster to manage. So I know he practiced most of the time in San Diego. Thank you. Your Honor, the case involving, I guess, the party who caused the problem isn't sitting here today with us. Foster, primary cause of the problem. Yes, but it's his money we're talking about. It's not Destler's own money. I understand. It's his money. And I understand your argument that the Ohio statute, Idaho statute may not apply at all because of the fact that it is his money. And one other important thing to point out that keeps on talking, we've heard from the respondent aptly about the, you know, that this was the August Augustus Stevenson Trust. It was, but as soon as the wife died, Deborah Foster died, it went into the irrevocable trust of Bill Foster. Bill Foster, in this irrevocable trust, could have taken all the money. It was a revocable trust. He was the one, Bill Foster was the one who made the determination upon Deborah's death to lock this money away where his creditors could never get it. And he was the one, he was the one who did that. So under the scheme that was set up, he did the affirmative act of moving the money from a revocable trust in his own name to an irrevocable trust beyond the reach of all his creditors, including Dr. Brooks. Thank you very much. Well, we'll recess till tomorrow morning at 930. Thank you. Thank you. Thank you.
judges: Pregerson, Graber, Gould